# **EXHIBIT B**

## **(Agreement of Sale)**

## AGREEMENT OF SALE

THIS AGREEMENT OF SALE (the "**Agreement**") is made this _____ day of January 2025 ("**Effective Date**") by and between ALFRED T. GIULIANO, SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE ("**Seller**") FOR THE BANKRUPTCY ESTATE OF THE UNIVERSITY OF THE ARTS, A PENNSYLVANIA NON-PROFIT CORPORATION ("**Debtor**") and TEMPLE UNIVERSITY - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, A PENNSYLVANIA NON-PROFIT CORPORATION ("**Buyer**"). The term "Effective Date" shall mean the date above that is the date this Agreement has been fully executed by all parties and Seller has received a fully executed, original counterpart of the same.

## BACKGROUND

A.     **WHEREAS**, on September 13, 2024 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

B.     **WHEREAS,** Seller is the duly appointed and acting Chapter 7 trustee for Debtor's bankruptcy case which is being jointly administered under Case No. 24-12140(BLS) (Jointly Administered) with the chapter 7 case of U of Arts Finance LLC (collectively, the "**Bankruptcy Cases**");

C.     **WHEREAS**, Debtor's estate is the fee simple owner of those certain tracts and parcels of ground located at 201-211 S. Broad Street, situate in the City of Philadelphia, Commonwealth of Pennsylvania and known as Terra Hall, being Tax Parcel No. 77-2-5054-10 all as more particularly described on **Exhibit A** attached hereto and incorporated hereby (the "**Premises**").

D.     **WHEREAS**, Seller, on behalf of the Debtor's estate, desires to sell the Premises to Buyer, and Buyer desires to purchase the Premises from Seller, upon the terms and conditions set forth herein.

E.     **WHEREAS,** the transactions contemplated by this Agreement (the "**Transactions**") will be consummated pursuant to an Approval Order (as defined below) to be entered in the Bankruptcy Cases pursuant to §§ 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     **SALE OF PREMISES**.

A.     **Property**. Subject to the terms and conditions set forth herein, Seller agrees to sell, convey and transfer to Buyer, and Buyer agrees to purchase from Seller, the Premises, including all the buildings, structures, fixtures and other improvements located thereon (the "**Improvements**"), together with (i) all of Seller's right, title, and interest in and to any and all

166418117.6

equipment, machinery and personal property located at the Premises and used in conjunction with the use, operation and maintenance of the Premises and Improvements, (ii) any land lying in the bed of any street, road or alley, open or proposed, in front, abutting or adjoining the Premises, (iii) any easement, privilege, license, or right-of-way relating to the Premises, (iv) any appurtenances and hereditaments belonging or otherwise pertaining to the Premises, and (v) to the extent assignable, all of Seller's right, title and interest in and to the licenses, permits, certificates and other intangible personal property relating to the use, operation or ownership of the Premises and the Improvements (collectively, along with the Premises and Improvements, the "**Property**").

B.      **Assumed Leases.** Buyer agrees to assume Debtor's obligations arising from and after the Closing Date under the leases identified on **Exhibit B** once approved by the Bankruptcy Court for assumption by Seller and assignment to Buyer ("**Assumed Leases**").  Buyer agrees to pay the Cure Amount (defined below), if any, associated with the assumption and assignment of the Assumed Leases, directly to the counterparty to the Assumed Leases promptly after approval of the assumption and assignment. In either event, the order approving assumption and assignment shall provide that upon payment of the Cure Amount by the Buyer, such counterparty shall not have any remaining claim against Seller or the Debtor related to any default under such Assumed Leases.  Seller makes no representation or warranty with respect to the future performance of any parties to the Assumed Leases.  Seller makes no representation or warranty as to whether the Assumed Leases can be assumed and assigned under applicable law or otherwise. For purposes hereof the "**Cure Amount**" as  referred to herein shall refer to the amount Buyer agrees to pay in conjunction with the assignment and assumption of the Assumed Leases not to exceed the amount set forth on **Exhibit B** (the **"Cap"**) or to the extent the Bankruptcy Court establishes a cure amount that exceeds the Cap (the "**Bankruptcy Court Cure Amount**"), then, the Bankruptcy Court Cure Amount, so long as such Bankruptcy Court Cure Amount is reasonably acceptable to Buyer.

2.      **PURCHASE PRICE**. The total purchase price to be paid by Buyer to Seller for the Property (the "**Purchase Price**") shall be Eighteen Million Dollars ($18,000,000) payable as follows:

A.      The sum of One Million Eight Hundred Thousand Dollars ($1,800,000), which represents ten percent (10%) of the Purchase Price, to be deposited with Seller, within two (2) business days after the Effective Date (the "**Deposit**"). Seller shall hold the Deposit in a non-interest-bearing account, pursuant to the terms of this Agreement.

B.      The Deposit shall be non-refundable (except as otherwise expressly set forth in this Agreement) and applied to the Purchase Price at the Closing (as hereinafter defined).

C.      The balance of the Purchase Price is to be paid by Buyer to Seller at the Closing (hereinafter defined), in immediately available federal funds, subject to adjustments, prorations and credits as herein provided.

3.      **COVENANTS PRIOR TO CLOSING**. Between the Effective Date and the date of Closing:

A.    **Bankruptcy Issues.** Seller and Buyer shall each use their reasonable efforts to secure the entry of an order (the "**Approval Order**") of the Bankruptcy Court in the Bankruptcy Cases in form and substance reasonably acceptable to Seller and Buyer containing provisions, including without limitation: (i) approving this Agreement, (ii) authorizing the sale of the Property pursuant to Section 363 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests (other than Permitted Exceptions (defined below)), (iii) authorizing the Transactions, (iv) providing that this Agreement and the Transactions are undertaken by Buyer and Seller at arm's length, without collusion, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, that Buyer and Seller are entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code are not applicable, and (v) finding that Buyer is not a successor to, nor does the Buyer have liability for, debts or obligations of, or claims against, the Debtor. After execution of this Agreement, Seller shall file a motion with the Bankruptcy Court seeking entry of the Approval Order (the "**Sale Motion**"). Subject to the Approval Order, Seller and Buyer shall use reasonable best efforts to make any reasonable filings, take all reasonable actions, and to obtain any and all other approvals and orders necessary for consummation of the Transactions. Buyer shall make commercially reasonable efforts to satisfy the evidentiary requirements for any finding concerning its ability to provide adequate assurance of future performance under Section 365 of the Bankruptcy Code, as required. Buyer acknowledges that consummation of the Transactions is subject to Seller's right to solicit higher and better offers from one or more third parties (other than Buyer) for the acquisition of all or substantially all the Property.  If, prior to the objection deadline for the Sale Motion (the "**Objection Deadline**"), Seller receives a binding offer for the Property that, taking into account Buyer's entitlement to the Termination Fee (defined below), is both higher and better than the Transaction as set forth in this Agreement  (a "**Competing Transaction**"), Seller shall disclose the identity of such Competing Transaction and the amount of the higher and better offer, and thereafter but in no event later than two business days after the Objection Deadline conduct an open call auction in which Buyer and any bidder submitting a bid for a Competing Transaction may participate (the "**Competing Bid Resolution Process**").  Seller, at its discretion, may determine required bid increments, provided, however, that Buyer may credit bid the Termination Fee.  At the conclusion of the auction, Seller shall determine which bid constitutes the highest and best offer for the Property and shall seek Bankruptcy Court approval thereof.  Buyer confirms that this Agreement is submitted in connection with the Bankruptcy Court approved Bid Procedures.

4.    **CLOSING; CLOSING DELIVERIES**.

A.    **Closing**. The closing ("**Closing**") shall occur on the later of January 29, 2025, or within ten (10) days following Seller's receipt of the Approval Order (such date the "**Closing Date**"), or such other date as Buyer and Seller may otherwise agree in writing but in no event later than May 31, 2025. Buyer acknowledges and agrees that it is an express condition precedent to Closing, that Seller shall have obtained and received the Approval Order. Closing shall be held via escrow through the services of Seller at which time all documents legally required to carry out the terms of this Agreement shall be executed and delivered upon satisfaction of applicable escrow conditions.

B.    **Seller's Closing Deliveries**: At Closing, Seller shall execute and deliver (acknowledged where necessary) to Buyer, or the Title Company (as hereafter defined), as applicable:

166418117.6

(i)      a special warranty deed (the "**Deed**"), conveying title to the Premises to Buyer;

(ii)      a bill of sale and assignment agreement (the "**Bill of Sale**") conveying the personal property of Seller situate on or within the Premises to Buyer;

(iii)      an affidavit which states that no Seller is a "foreign person" as set forth in Section 1445 of the Internal Revenue Code of 1986, as amended ("**Code**");

(iv)      the Closing Date Certificate (defined below);

(v)      all other customary and reasonable forms, including transfer and recordation tax declarations, or other similar documents required to be executed by Seller in connection with the recordation of the Deed or required to be executed by Seller by any federal, state or local government authority in connection with the Transactions, duly executed and acknowledged, as appropriate, by Seller and such other affidavits and documents as are reasonably required by Buyer's title company ("**Title Company**") to issue to Buyer the Owner's Policy in the form provided for in this Agreement, including, without limitation, a customary owner's title affidavit in form and substance reasonably acceptable to the Title Company and sufficient for the Title Company to delete any exceptions for (a) mechanics' or materialmen's liens arising from work at the Property, and (b) parties in possession, other than tenants as tenants only;

(vi)      a signed assignment and assumption of rents and lease agreement, in form and substance acceptable to Buyer and Seller (the "**Assignment**") of the Assumed Leases at Closing; and

(vii)      a signed settlement statement.

The legal description attached to the Deed shall be the same as the legal description in the deed by which Debtor took title to the Premises.

C.      **Buyer's Closing Deliveries**: At Closing, Buyer shall execute and deliver (acknowledged where necessary) to Seller or Title Company, as applicable:

(i)      the balance of the Purchase Price;

(ii)      such other affidavits and documents as are reasonably required by the Title Company to issue to Buyer the Owner's Policy as set forth in this Agreement;

(iii)      a signed counterpart of the Assignment; and

(iv)      a signed settlement statement.

D.      **Tender Waived**. Formal tender of an executed deed and purchase money is hereby waived.

5.      **APPORTIONMENTS**. At Closing, the following apportionments shall be made as of 12:00 a.m. local time on the Closing Date:

A.    **Real Estate Taxes**. Real estate taxes shall be apportioned on a per diem basis on the basis of the fiscal or calendar year of each taxing authority.

B.    **Water, Sewer and Other Utility Charges**. Any water, sewer, electric, gas or other utility charges assessed against or incurred with respect to the Premises, and rental income from the Assumed Leases shall be apportioned on a per diem basis.

C.    **Real Estate Transfer Taxes**. All real estate transfer taxes imposed by any governmental body or bodies shall be split equally between Buyer and Seller. Notwithstanding the foregoing or anything to the contrary, Buyer shall be solely responsible for, and shall indemnify, defend, and hold Seller harmless from any and all transfer taxes imposed in connection with an assignment of this Agreement by Buyer. In the event Buyer assigns this Agreement, Buyer shall provide proof satisfactory to Seller that such taxes have been paid at or prior to Closing.

D.    **Other Closing Costs.** Buyer shall be responsible for the following fees and expenses in connection with the Closing: (i) the cost of issuance of the Owner's Policy, (ii) the cost of issuance of any lender's policy of title insurance, (iii) the cost of recording any mortgage granted by Buyer, (iv) all of the reasonable escrow fees charged by Seller, and (v) broker fees to Newmark. Buyer shall be responsible for the costs of recordation of the Deed.  Each party shall pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby, including, without limitation, all accounting and legal fees.

6.    **REPRESENTATIONS AND WARRANTIES**.

A.    **Representations and Warranties of Seller**. In order to induce the Buyer to enter into this Agreement and purchase the Property, and with full knowledge that the Buyer is relying thereon, the Seller hereby warrants and represents to the Buyer as follows:

(i)    **Authorization**. Subject to the entry of the Approval Order by the Bankruptcy Court, Seller has full legal capacity, right, power and authority to enter into this Agreement. Subject to the entry of the Approval Order by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions are within Seller's powers and have been duly authorized by all necessary actions on the part of Seller. Subject to entry of the Approval Order by the Bankruptcy Court, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms.

(ii)    **Title to Premises**. Debtor's estate is the fee simple owner of the Premises, subject to the Permitted Exceptions (as hereinafter defined). Seller has not received written notice of any condemnation, expropriation or other proceeding in eminent domain, affecting any parcel of the Premises or Improvements, or any portion thereof or interest therein.

(iii)    **Compliance**. Seller has, or will have as of the applicable deadline, provided all notice required by (a) the United States Bankruptcy Code, (b) the Federal Rules of Bankruptcy Procedure; (c) the Local Rules of the United States Bankruptcy Court for the District of Delaware and (d) any order of the Bankruptcy Court.  Parties upon which Seller has or will provide such notice include, but are not limited to, (i) all creditors that have timely filed a proof of claim against the Debtor, (ii) all parties that have requested notice in the Bankruptcy Cases, (iii)

5

all individuals or entities known to the Seller to have an interest in acquiring the Property or any portion thereof, (iv) the Office of the United States Trustee, (v) any city, state or Federal governmental or regulatory authority with jurisdiction or authority over or relating to the Debtor or the Property and (vi) any individual or entity having an interest in or right regarding the Property or any portion thereof including holders of options, rights of first refusal, rights of first offer or other rights to purchase the Property or any portion thereof.

Any change of facts or circumstances not intentionally caused by Seller that render any of the representations and warranties of Seller set forth in this Agreement inaccurate, incomplete, incorrect or misleading in any material respect (each a "**Permitted Change**") shall not constitute a breach or default by Seller under this Agreement. The parties agree that if, on or prior to Closing, Buyer has knowledge (either by way of Seller's notice or otherwise) that any representation or warranty of Seller is inaccurate, incomplete, incorrect or misleading, and notwithstanding the foregoing Buyer elects to close the transaction (as opposed to terminating this Agreement), Buyer shall have no claim against Seller, and Seller shall have no liability, in connection with a breach of such representation or warranty and Buyer shall not look to Seller for any redress or relief thereof

      B.    <u>**Representations and Warranties of Buyer**</u>. In order to induce the Seller to enter into this Agreement, the Buyer hereby warrants and represents to the Seller that:

      (i)    <u>**Due Authorization**</u>. Buyer is a duly formed and validly existing non-profit corporation in good standing under the laws of the Commonwealth of Pennsylvania. Buyer has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and all documents contemplated hereby by Buyer have been duly and validly authorized by all necessary action on the part of Buyer, and all required consents and approvals have been duly obtained and will not result in a breach of any of the terms or provisions of, or constitute a default under any indenture, agreement and/or instrument to which Buyer is a party. This Agreement is a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting the rights of creditors generally.

      (ii)    <u>**OFAC**</u>. Neither Buyer nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents is, nor will they become, a person or entity with whom United States persons or entities are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including, without limitation, the September 24, 2001, Executive Order Blocking Premises and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

      (iii)    <u>**Consents.**</u> No authorization, consent or approval of any governmental authority (including, without limitation, courts) is required for the execution and delivery by Buyer of this Agreement or the performance of its obligations hereunder.

(iv)    **Bankruptcy Matters**. Buyer has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by its creditors, suffered the appointment of a receiver to take possession of substantially all of its assets, suffered the attachment or other judicial seizure of substantially all of its assets, admitted its inability to pay its debts as they come due, or made an offer of settlement, extension or composition to its creditors generally.

(v)    **Conflict.** Neither the execution, delivery or performance of this Agreement nor compliance herewith (A) conflicts or will conflict with or results or will result in a breach of or constitutes or will constitute a default under (x) the articles of incorporation and by-laws or other organization certificate and/or partnership or operating agreement of Buyer, or (y) to Buyer's knowledge, any law or any order, writ, injunction or decree of any court or governmental authority, or (B) results in the creation or imposition of any lien, charge or encumbrance upon its Premises pursuant to any such agreement or instrument.

(vi)    **Sufficient Funds; Adequate Assurance**.  Buyer has and will have at the Closing immediately available funds sufficient for the satisfaction of all of its obligations under this Agreement, including the payment of the Purchase Price, and all fees, expenses of and other amounts required to be paid by Buyer in connection with the Transactions contemplated hereby. Buyer will be capable of satisfying the conditions contained in §§ 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Leases. Buyer's obligations under this Agreement are not contingent upon Buyer procuring financing for the transactions contemplated hereby.

(vii)    **No Collusion**.  Buyer represents and warrants that it has not engaged in any collusion with respect to its bid on the Property and the Transactions contemplated hereunder.

(viii)    **No Claims**. There are no material claims, actions, suits, proceedings, or investigations pending, or to the current actual knowledge of Buyer's officers, members and directors, without an obligation of independent inquiry, threatened against Buyer that could materially impair Buyer's ability to fulfill and perform Buyer's obligations under this Agreement.

7.    **CONDITION OF PREMISES; TAX APPEAL; TITLE**.

A.    **AS-IS SALE**. Buyer is a sophisticated investor and its decision to purchase the Property is based upon its own independent expert evaluations of such facts and materials deemed relevant to Buyer and its agents. Buyer has not relied in entering into this Agreement upon any oral or written information from the Seller or any of the Seller's agents, consultants, advisors or representatives except the Seller's Representations expressly set forth in this Agreement. Without limiting the generality of the foregoing, except as otherwise expressly provided herein, **BUYER ACKNOWLEDGES AND AGREES WITH SELLER THAT BUYER IS PURCHASING THE PROPERTY IN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION ON THE CLOSING DATE, INCLUDING ANY LATENT DEFECT OR NON-DISCOVERABLE DEFECT, SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR**

166418117.6

**IMPLIED OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER AND SELLER DISCLAIMS AND BUYER WAIVES ANY AND ALL WARRANTIES, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR AS TO ANY ENVIRONMENTAL MATTERS. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS, REAL ESTATE BROKERS, "SET-UPS," OFFERING MEMORANDA OR INFORMATION PERTAINING TO THE PREMISES FURNISHED BY ANY REAL ESTATE BROKER, ADVISOR, CONSULTANT, AGENT, EMPLOYEE, REPRESENTATIVE OR OTHER PERSON. THE FOREGOING SHALL NOT RELEASE SELLER FROM ITS EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS AGREEMENT.**

B.    **Tax Appeal.** The Buyer acknowledges that there is currently an ongoing real estate market value tax appeal concerning the Property for Tax Year 2025, and for all years thereafter until the Tax Appeal (as hereafter defined) is fully and finally resolved (the "**Tax Appeal**"). Buyer acknowledges and agrees that any tax refunds, overpayments, or adjustments resulting from the Tax Appeal for the period prior to the Closing Date shall be the sole property of, and retained by, Seller. Seller shall have the exclusive right to any such tax refunds or overpayments arising from the period prior to the Closing Date. Notwithstanding the foregoing, should the Tax Appeal not be fully and finally adjudicated or otherwise resolved prior to the Closing Date, Seller shall be entitled to any such tax refunds, overpayments or adjustments resulting from the Tax Appeal that apply to any period that includes the Closing Date, and Buyer shall be entitled to such refunds, overpayments or adjustments for all periods after the Closing Date. Prior to the Closing Date, Seller shall not settle or take any material action with respect to the Tax Appeal without the consent of Buyer, which consent may not be unreasonably withheld, conditioned or delayed. To the extent that the proceeds from the Tax Appeal are mailed to the applicable Premises, Buyer shall, within two (2) business days, send via Federal Express overnight mail such proceeds (or, if applicable, the portion thereof due to Seller) to Seller at the notice address below. Subject to the foregoing, Buyer and Seller agree to cooperate with each other in any reasonable manner to facilitate the resolution of the Tax Appeal. For avoidance of doubt, if the Tax Appeal is not resolved prior to Closing, Buyer shall (i) notify the City of Philadelphia of the sale of the Property within five (5) days following the Closing Date and (ii) be solely responsible for all matters relating to the Tax Appeal and diligently pursuing the Tax Appeal, in good faith, to full and final adjudication. The provisions of this Section 7.B shall survive Closing.

C.    **Title to Property.** Title to the Premises at Closing shall be fee simple, good, marketable and insurable at regular rates, free and clear of all liens and encumbrances and subject only to the Permitted Exceptions. For purposes of this Agreement, "**Permitted Exceptions**" shall mean (a) any and all declarations, restrictions, covenants, conditions, liens, encumbrances, easements of public and private roads and easements, privileges and rights necessary for utility companies; whether set forth in Buyer's title commitment or otherwise of record, or which may be either visible upon the ground; (b) any matters of survey affecting title that would be shown on an accurate survey of the Property; and (c) any and all laws, ordinances, rules and regulations of any governmental or quasi governmental body having jurisdiction over the Property. The Permitted Exceptions known to Seller as of the date of this Agreement are set forth and attached hereto as **Exhibit C**.

8

166418117.6

(i)    **No New Exceptions**.  From and after the Effective Date and continuing until Closing, Seller shall not execute any deed, easement, restriction, contract, covenant or other matter affecting title to the Property unless Buyer has received a copy thereof and has approved the same in writing, in its sole and absolute discretion.

8.    **CONDITIONS PRECEDENT TO CLOSING**.

A.    **Conditions Precedent**.  The obligation of the parties to close on the sale of the Property in accordance with this Agreement is subject to satisfaction of each of the following conditions (the "**Conditions Precedent**"), any of which may be waived in whole or in part by the applicable party on or prior to the Closing:

(i)    **Certificate of Representations and Warranties**.  Each party's representations set forth in this Agreement above shall be true and correct in all material respects on the Closing Date, as though made on such date (the "**Representation Condition**").  For purposes of determining whether the Representation Condition has been satisfied, each party will deliver to the other at Closing a certificate (the "**Closing Date Certificate**") certifying that all of the representations and warranties remain true and correct, as of the Closing Date and in all material respects, except for changes and qualifications specified in such Closing Date Certificate, such that the Closing Date Certificate is true and accurate in all material respects. If either party's representations are untrue in any material respect as indicated on the Closing Date Certificate (other than as a result of a Permitted Change), it shall be considered an event of default and the parties shall have the respective rights set forth in Section 11 below.

(ii)    **Compliance with Covenants**.  Each party shall have performed and complied, in all material respects, with all of the material terms, conditions and covenants required by this Agreement to be performed and complied with prior to or on the Closing Date.

(iii)    **Bid Protections**.

(a)    In the event that Seller receives a Competing Transaction and thereafter, upon the conclusion of the Competing Bid Resolution Process, an individual or entity party to a Competing Transaction is determined to be entitled to purchase the Property and Buyer has not otherwise defaulted on its obligations hereunder, in addition to such other rights as Buyer may have hereunder, including but not limited to return of its Deposit, Buyer shall receive from the proceeds of the sale of the Property in a Competing Transaction a breakup fee equal to three percent (3%) of the Purchase Price (the "**Break-Up Fee**") and reimbursement of reasonable and documented expenses up to (2%) of the Purchase Price (the "**Expense Reimbursement**" and together with the Break-Up Fee, the "**Termination Payment**").  The Termination Payment shall be paid solely from the proceeds of a Competing Transaction.

(iv)    **Receipt of Approval Order**.

(a)    The Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases  authorizing the Transactions and approving this Agreement under Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Buyer, and the Approval Order shall contain findings, including, but not

166418117.6

limited to,  that Buyer acquired the Property in good faith, for fair value, in an arm's length transaction, and such other findings and conclusions as are set forth in Section 3 of this Agreement, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed;

(b)    the Bankruptcy Court shall have either (i) waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order or (ii) such stay shall have expired pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order; and

(c)    No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

B.    **Buyer's Rights If Conditions Precedent Are Not Satisfied**. Except as provided in Section 8.D below, if, on the Closing Date, any of the Conditions Precedent to the Buyer's obligation to consummate the purchase of the Premises have not been satisfied, (except for the condition precedent set forth in Section 8.A.(iv) above in which event this Agreement shall automatically terminate and the Deposit returned to Buyer), and provided the Buyer is not in default of its obligations herein, the Buyer shall elect to either (1) waive such of those conditions as are unsatisfied and proceed to Closing without abatement of the Purchase Price; or (2) terminate this Agreement, in which latter event, the Deposit shall be refunded to Buyer and the parties hereto shall be released from all liabilities and obligations under this Agreement, except those which expressly survive termination of this Agreement. The foregoing shall not limit the Buyer's rights in the event the Conditions Precedent are not satisfied as a result of the Seller's default in accordance with Section 11.B below.

C.    **Seller's Rights If Conditions Precedent Are Not Satisfied**. Except as provided in Section 8.D below, in the event Seller does not receive the Approval Order to sell the Property to Buyer, this Agreement shall automatically terminate, the Deposit shall be returned to Buyer, and neither party shall have any other right, obligation, or liability hereunder (except for those which expressly survive).  If, on the Closing Date, any of the other Conditions Precedent to Seller's obligation to consummate the purchase of the Premises have not been satisfied (except for the condition precedent set forth in Section 8.A.(iv) above), Seller shall elect to either (1) waive such of those conditions as are unsatisfied and proceed to Closing without abatement of the Purchase Price; or (2) terminate this Agreement, in which latter event, the Deposit shall be refunded to Buyer and the parties hereto shall be released from all liabilities and obligations under this Agreement, except those which expressly survive termination of this Agreement. The foregoing shall not limit Seller's rights in the event the Conditions Precedent are not satisfied as a result of Buyer's default in accordance with Section 11.A below.

D.    **Backup Bidder**.  Upon the entry of an order of the Bankruptcy Court authorizing the sale of the Property to a party to a Competing Transaction ("**Other Approval Order**"), Buyer shall not be permitted to terminate this Agreement upon the entry of such an order if Buyer is determined to be the second highest bidder for the Property, in which case Buyer is required to remain bound by the terms of this Agreement pursuant until the earlier of (1) closing of the Competing Transaction or (2) thirty (30) days after entry of the Other Approval Order.

10

9.  **CONDEMNATION OR CASUALTY**. The risk of loss or damage to the Property from fire or other casualty or any other cause or condemnation shall remain with Seller until the Closing.  If, prior to Closing, all or any part of Property is destroyed or damaged as a result of fire or any other casualty or is taken by eminent domain proceedings or a notice of any eminent domain proceeding with respect to the Premises or any part thereof is received by the Seller, the Seller shall immediately give written notice thereof to Buyer. In the event of a casualty or eminent domain taking or notice as aforesaid, Buyer, may, at its sole option and it is sole discretion, either elect to (i) terminate this Agreement by delivering written notice to Seller within five (5) days after Buyer receives notice of such casualty, and receive a refund of the Deposit; or (ii) proceed to Closing under the terms and conditions of this Agreement, without abatement or reduction of the Purchase Price, and in which event, Seller shall assign and transfer any and all insurance proceeds or condemnation awards at Closing and pay to Buyer any and all insurance proceeds or condemnation awards actually received by Seller at Closing or thereafter upon receipt.

10.  **REAL ESTATE BROKERS**. The Seller and Buyer respectively warrant to each other that no finders, real estate brokers or other persons entitled to claim a fee or commission have interests in this transaction, other than (i) Jones Lang LaSalle Americas, Inc. ("**JLL**"), whose fees and commissions shall be paid by Seller pursuant to a separate agreement between Seller and JLL, and (ii) Newmark, ("**Newmark**") whose fees and commissions shall be paid by Buyer pursuant to a separate agreement between Buyer and Newmark. Seller and Buyer respectively warrant to each other that they have not had any dealings with any other person which may entitle that person to a fee or commission. The Seller and the Buyer hereby agree to indemnify and hold the other harmless against any losses, costs or expenses (including attorney's fees) arising out of any claim of any broker or finder in engaged by the party breaching the representation above. The terms of this Section 10 shall survive the Closing Date.

11.  **DEFAULT**.

A.  **By Buyer**. If the Buyer fails to fulfill or perform any of the terms or conditions of the Agreement required to be performed by Buyer, and/or fails to complete Closing and such failure is not a result of Seller's default hereunder, and in either case such failure continues for five (5) days after receipt of written notice from Seller, then as the Seller's sole and exclusive remedy, Seller may retain the Deposit as liquidated damages and not a penalty, such amount being agreed between Buyer and Seller to be a necessary condition to this Agreement to compensate the Seller for expenses and expenditures incurred and made in connection therewith, as the damages sustained as a result of the Buyer's non-compliance with this Agreement. Seller hereby waives any and all rights it may now or hereafter have to pursue any other remedy or recover any other damages on account of any such breach or default of the terms of this Agreement by Buyer, including, without limitation, specific performance, loss of bargain, special, punitive, compensatory or consequential damages. Thereupon, this Agreement shall become null and void and of no further force or effect and both parties shall be released of further liability and obligations hereunder, except for those liabilities and obligations which expressly survive termination of this Agreement.

B.  **By Seller**. If the Seller defaults in the performance of its obligations under this Agreement and such failure continues for five (5) days after receipt of written demand from Buyer ("**Buyer Notice**"), or if Buyer determines that any of Seller's Representations were untrue

166418117.6

in any material respect as of the Effective Date, Buyer, as Buyer's sole and exclusive remedy, shall either elect to (a) exercise any right that Buyer may have to compel specific performance of Seller's obligations hereunder, which action for specific performance must be filed no later than thirty (30) days after the issuance of the Buyer Notice, or (b) terminate this Agreement, in which latter event the Seller shall return the Deposit to Buyer, as Buyer's sole and exclusive remedy,  and thereupon this Agreement shall become null and void and of no further force and effect and both parties shall be released of further liability and obligations hereunder, except for those liabilities and obligations which expressly survive termination of this Agreement.

C.    **Prevailing Party** If Seller commences any legal action involving this Agreement, the prevailing party in such action shall be entitled to be reimbursed by the other for all attorneys' fees and court costs in connection with any such action.

12.    **GENERAL PROVISIONS**.

A.    **Binding Effect**.

(i)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns. Buyer shall have the right to assign this Agreement to an entity in which controls, is controlled by or is under common control with Buyer. In the event Buyer assigns this Agreement, then notwithstanding anything herein to the contrary, (i) the Buyer shall pay for the entirety of any transfer taxes (city, county, state, school, or otherwise) payable in connection with any assignment of this Agreement as provided for aforesaid; (ii) no assignment (permitted or otherwise) of this Agreement shall relieve the Buyer from any of its obligations hereunder; (iii) no such assignment shall have the effect of delaying the Closing in any respect; (iv) the Seller agrees to cooperate in executing any document, instrument or other agreement necessary to facilitate such transfer so long as the same shall not alter the Buyer's obligations in any way; and (v) the Buyer shall indemnify and hold harmless the Seller party from any and all losses in connection with any such assignment, which indemnification shall survive Closing and shall survive the expiration or termination of this Agreement.

B.    **Entire Agreement**. This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior negotiations, understandings and agreements of any nature whatsoever with respect to the subject matter hereof. No amendment, waiver or discharge of any provision of this Agreement shall be effective against either party unless that party shall have consented thereto in writing.

C.    **Governing Law**. This Agreement shall be governed, interpreted, and construed in accordance with the internal laws of the Commonwealth of Pennsylvania without giving effect to principles of conflicts or choice of laws.

D.    **Waiver of Trial by Jury**. EACH PARTY HEREBY WAIVES, IRREVOCABLY AND UNCONDITIONALLY, TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY OF THE DOCUMENTS AND/OR INSTRUMENTS EXECUTED IN CONNECTION HEREWITH, THE PROPERTY OR ANY CLAIMS, DEFENSES, RIGHTS OF

SET-OFF OR OTHER ACTIONS PERTAINING HERETO OR TO ANY OF THE FOREGOING.

       E.    **Notices**. All notices or other communications required or permitted to be given under the terms of this Agreement shall be in writing, sent by Certified Mail, postage prepaid, return receipt requested, facsimile, email (with original to follow in mail) or by private carrier guaranteeing next day service, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein and addressed as follows:

    (1)    If to the Seller, addressed as follows:

> Alfred T. Giuliano
> Chapter 7 Trustee of The University of the Arts
> 2301 E. Evesham Road
> Pavilion 800, Suite 201
> Vorhees, NJ  08043
> E-mail: atgiuliano@giulianomiller.com

> With a copy to:

> Fox Rothschild LLP
> 2001 Market Street, Suite 1700
> Philadelphia, PA 19103
> Attn: Michael Menkowitz, Esq.
> Email: mmenkowitz@foxrothschild.com

> And

> Chipman Brown Cicero & Cole, LLP
> Hercules Plaza
> 1313 N. Market Street, Suite 5400
> Wilmington, DE 19801
> Attn: David Carickhoff, Esq.
> Email : carickhoff@chipmanbrown.com

    (2)    If to Buyer, addressed as follows:

> Temple University
> 1330 Polett Walk
> Sullivan Hall, Garden Level
> Philadelphia, PA 19122
> Attn: Kenneth H. Kaiser, SVP and COO
> Email: ken.kaiser@temple.edu

> With a copy to:

> Office of University Counsel

13

Temple University
1330 Polett Walk
Sullivan Hall, Garden Level
Philadelphia, PA 19122
Email: ucounsel@temple.edu

And

Polsinelli
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA 19103
Attn:  Paul J. Jaskot
Email: paul.jaskot@polsinelli.com

And

Holland & Knight LLP
10 St. James Avenue, 11th Floor
Boston, MA 02116
Attn:  John Monaghan
Email: john.monaghan@hklaw.com

or to such other address or addresses and to the attention of such other person or persons as any of the parties hereto may notify the others in writing in accordance with the provisions of this Agreement.

F.    **Captions**. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

G.    **Business Days**. If the last day for performance of any act or exercise of any right falls on a Saturday, Sunday or legal holiday, such last day for performance or exercise of such right shall be extended to the next day that is not a Saturday, Sunday or legal holiday.

H.    **Zoning Classification**:  The current zoning classification of the Property under the Zoning Code of Philadelphia County, Pennsylvania is CMX5 – Center City Core Commercial Mixed-Use; provided, however, Seller makes no representations or warranties as to the accuracy of such zoning classification.

I.    **Consequential Damages**.    Anything herein to the contrary notwithstanding, neither of the parties shall be liable to the other for any consequential or indirect losses or damages of the other party arising pursuant to this Agreement.

J.    **Severability**. If any provision of this Agreement shall be held or deemed to be, or shall in fact be, invalid, inoperative or unenforceable as applied to any particular case in any jurisdiction or jurisdictions, or in all jurisdictions or in all cases, because of the conflict of any

14

provision with any constitution or statute or rule of public policy or for any other reason, such circumstance shall not have the effect of rendering the provision or provisions in question invalid, inoperative or unenforceable in any other jurisdiction or in any other case or circumstance or of rendering any other provision or provision herein contained invalid, inoperative or unenforceable to the extent that such other provisions are not themselves actually in conflict with such constitution, statute or rule of public policy, but this Agreement shall be reformed and construed in any such jurisdiction or case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such jurisdiction or in such case.

K.    **Counterparts**. This Agreement may be executed in counterparts, including Docu-Sign or PDF signatures, which together shall constitute one agreement. The contract formation pursuant to this Agreement and record-keeping of this Agreement through electronic means shall have the same legal validity and enforceability as a manually executed or paper-based recordkeeping system to the fullest extent permitted by applicable Governmental Requirements, including without limitation, the Federal Electronic Signatures in Global and National Commerce Act, the Uniform Electronic Transactions Act or any similar state law, and the parties to this Agreement hereby waive any objection to the contrary.

**SIGNATURES APPEAR ON FOLLOWING PAGE**

166418117.6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed the day and year first above written.

<div style="margin-left:50%;">

**SELLER**:

ALFRED T. GIULIANO, SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF THE UNIVERSITY OF THE ARTS, a Pennsylvania non-profit corporation

By: _____

Name: _____

Title: _____

**BUYER**:

TEMPLE UNIVERSITY - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, a Pennsylvania non-profit corporation

By: _____

Name: _____

Title: _____Kenneth Kaiser - SVP/COO____

</div>

16

**Exhibit A**

**Legal Description**

ALL THAT CERTAIN lot or piece of land, premises and ground with the improvements thereon.

SITUATE in the Fifth Ward of the City and County of Philadelphia, Commonwealth of Pennsylvania, as shown on a certain Plan of Minor Subdivision for 201-211 South Broad Street, Prepared by Paulus, Sokolowski and Sartor, LLC as Drawing No. 03090.001.007, dated 05/30/06 being bounded and described as follows:

BEGINNING at the point of intersection of the Southerly line of Walnut Street, (59 feet 3 inches wide) and the easterly line of South Broad Street, (113 feet wide); thence

1. Eastwardly 100.00 feet along the Southerly line of Walnut Street to a point at the intersection of the Southerly line of Walnut Street and the Westerly line of Watts Street, (10 feet wide); thence

2. Southwardly 138.00 feet, along the Westerly line of Watts Street and partly along a 50 feet wide Court to a point; thence

3. Westwardly 100.00 feet, parallel with Walnut Street, to a point in the Easterly line of South Broad Street; thence

4. Northwardly 138.00 feet along the Easterly line of South Broad Street to the point and place of beginning.

CONTAINING 0.32 acres of land, more or less.

And all the estate, right, title and interest of the grantor of, in and to a strip or piece of ground immediately adjoining the above lot or piece of ground at the Southeastern most corner thereof.

BEGINNING at a point in the East line of said Lot at the distance of 120 feet Southward from the South side of Walnut Street.

CONTAINING 7 feet 6 inches in width East and West by 18 feet in length North and South.

TOGETHER with the common use, right, liberty and privilege of the said Watts Street leading Northward into said Walnut Street.

Also of the Westernmost 10 feet in breadth East and West by the whole depth North and South of the 50 feet wide Court as and for a passageway and watercourse at all times hereafter.

AND TOGETHER with all and every right, title, interest, estate, liberty and privilege which St. George Tucker Campbell at and immediately before the time of his decease or which his heirs, executors or trustees have since had held or enjoyed on the whole, or any part of the said 50 feet wide Court and Chancellor Street (10 feet wide) leading therefrom Eastward into Juniper Street as appurtenant to the premises or any part thereof or otherwise forever.

17

166418117.6

AND TOGETHER with all right, title and interest of the grantor if any of, in and to any land lying in the bed of any streets open or proposed in front of or adjoining the premises described herein to the center line thereof.

Excepting out from the above described land, premises and ground, all that certain lot or piece of land, premises and space with the improvements therein and thereon.

SITUATE in the Fifth Ward of the City and County of Philadelphia, Commonwealth of Pennsylvania, to be conveyed to the Southeastern Pennsylvania Transportation Authority, located, lying and being within the bounds of two adjacent volumes of space whose horizontal surfaces are parallel with and projected vertically from horizontal planes based on the City of Philadelphia elevation datum at the surface of the Earth, as shown on a plan of Minor Subdivision for 201-211 South Broad Street, Prepared by Paulus, Sokolowski and Sartor, LLC as drawing No. 03090.001.007, dated 05/30/06, consisting of an existing stairwell connecting South Broad Street with the City of Philadelphia subway concourse near Walnut Street Station and being bounded and further described as follows:

BEGINNING at a point in the Easterly right-of-way line of South Broad Street (113 feet wide) at Elevation 41.40 feet as referenced to the Philadelphia City Elevation datum and based on City Plan No. 308, dated December 1966 and by ordinance dated 4/18/81, said beginning point being distant and measured Southwardly 99.04 feet, (US measure 99.29 feet) along the Easterly line of South Broad Street from the intersection of the Easterly right-of-way line of South Broad Street with the Southerly right-of-way line of Walnut Street (59.25 feet wide); thence with US measure

1. Eastwardly 14.30 feet along the face of the existing wall of the Northerly line of the said stairwell, forming a vertical plane extending from and parallel with said stairwell Northerly line, projecting vertically above to the existing ceiling at elevation 49.80 feet and projecting vertically below to the extended horizontal plane of the underside of a certain lower floor at elevation 25.00 feet, to a corner where the existing ceiling of said stairwell projects vertically downwards to elevation 39.64 feet; thence

2. Continuing Eastwardly 3.16 feet along the face of the existing wall of the Northerly line of the said stairwell, forming a vertical plane extending from and parallel with said stairwell Northerly line, projecting vertically above to the face of the lower ceiling of the said stairwell at elevation 39.64 feet and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet, to a corner of said stairwell; thence

3. Southeastwardly 3.74 feet along the face of the existing wall of the Northeasterly line of said stairwell, forming a vertical plane extending from and parallel with the said stairwell Northeasterly line, projecting vertically above to the lower ceiling of the said stairwell at elevation 39.64 feet and projecting vertically below to the extended Horizontal Plane of a certain lower floor at elevation 25.00 feet, to a corner of said stairwell; thence

4. Southwardly 10.20 feet, parallel with the Easterly line of South Broad Street, along the face of the existing wall of the easterly line of the said stairwell, forming a vertical plane extending from

18

and parallel with the said stairwell Easterly line, projecting vertically above to the lower ceiling of the said stairwell at elevation 39.64 feet and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet, to a corner of said stairwell; thence

5. Southwestwardly 3.78 feet along the face of the existing wall of the said stairwell, forming a vertical plane extending from and parallel with the said stairwell existing wall, projecting vertically above to the ceiling of the said stairwell at elevation 39.64 feet and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet, to a corner of said stairwell; thence

6. Westwardly 7.43 feet along the face of the existing wall of the said stairwell, forming a vertical plane extending from and parallel with the said stairwell existing wall, projecting vertically above to the lower face of the steel beam supporting the floor of the existing ceiling of the said stairwell at elevation 38.88 feet and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet, to a corner of the said stairwell; thence

7. Southwardly 12.54 feet parallel with the Easterly line of South Broad Street, along the face of the existing wall of the Easterly line of the said stairwell, forming a vertical plane extending from and parallel with the said stairwell Easterly line, projecting vertically above to the lower ceiling of the said stairwell at elevation 38.88 feet and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet to a corner of the said stairwell; thence

8. Westwardly 6.30 feet along the face of the existing wall of the Southerly line of the said stairwell, forming a vertical plane extending from and parallel with the said stairwell Southerly line, projecting vertically above to the lower ceiling of the said stairwell at elevation 38.88 feet and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet to a point in the Easterly right-of-way line of South Broad Street; thence

9. Westwardly 1.84 feet still along the face of the existing wall of the Southerly line of the said stairwell, forming a vertical plane extending from and parallel with the said stairwell Southerly line, projecting vertically above to the lower ceiling of the said stairwell at elevation 34.45 feet and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet to a point in the Easterly right-of-way line of South Broad Street; thence

10. Westwardly 1.86 feet still along the face of the existing wall of the Southerly line of the said stairwell, forming a vertical plane extending from the said stairwell Southerly line, projecting vertically above to a sloping lower ceiling of the said stairwell beginning at elevation 34.45 feet and ending at the Easterly line of South Broad Street at elevation 32.85 and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet to a point in the easterly right-of-way line of South Broad Street; thence

11. Northwardly 28.06 feet along the Easterly right-of-way line of South Broad Street, forming a vertical plane extending from and parallel with the Easterly line of South Broad Street, projecting vertically above to the lower ceiling of the said stairwell as existing and projecting vertically below to the extended horizontal plane of a certain lower floor at elevation 25.00 feet to the point and place of beginning.

19

CONTAINING 430.324 SF of land and 6,847.500 cubic feet of air space.

EXCEPTING all that air space for a proposed elevator shaft connecting South Broad Street with the subway concourse near Walnut Street station, being a portion and part of and passing through the existing stairwell lot and airspace described above:

BEGINNING at a point in the division wall between the existing stairwell connecting South Broad Street (113 feet wide) and the building occupying 201-211 South Broad Street, to the subway concourse near Walnut Street Station, at Elevation 41.40 feet as referenced to the Philadelphia City Elevation datum and based on City Plan No. 308, dated December 1966 and by ordinance 4/18/81, said beginning point at, above and below an air space being projected vertically upward to elevation 54.96 feet and vertically downward to elevation 4.46 feet, said beginning point being distant and measured the following two courses from the intersection of the Easterly right-of-way line of South Broad Street (113 wide) with the Southerly right-of-way line of Walnut Street (59.25 feet wide); thence

A. Southwardly, 97.75 feet (US measure 98.00 feet) along the Easterly right-of-way line of South Broad Street to a point in the said division wall; thence with US measure

B. Eastwardly 2.44 feet through said division wall, at right angles to the Easterly line of South Broad Street to the said point of beginning; thence

1. Eastwardly 9.833 feet through the said division wall, at right angles to South Broad Street to a point; thence

2. Southwardly 10.437 feet parallel to South Broad Street to a point; thence

3. Westwardly 9.833 feet to a point; thence

4. Northwardly 10.437 feet parallel to South Broad Street to the point and place of beginning.

CONTAINING 102.627 square feet of land and 5,182.664 cubic feet of air space.

TOGETHER with the above described proposed elevator shaft an air space for a proposed footing supporting the proposed elevator shaft connecting South Broad Street with the subway concourse near Walnut Street Station, centered on the bottom of the proposed elevator shaft at elevation 4.46 feet, being 12.021 feet in width parallel with course 2 and 4 of the above mentioned proposed elevator shaft, being 11.377 feet in depth parallel with course 1 and 3 of the above mentioned proposed elevator shaft and extending vertically below to elevation 3.46, containing 136.763 SF of land and 136.763 CF of air space.

BEING known as No. 201-11 South Broad Street.

166418117.6

**Exhibit B**

**Assumed Leases**

| Lease | Cure |
|---|---|
| Lease Agreement between The University of the Arts, as Landlord and JPMorgan Chase Bank, N.A. dated January 30, 2024 | $229,000.00 |
| Equipment Services Contract No. 500-50178474 for HVAC cooling systems with Engie Resources, as assigned to De Lange Landen Financial Services, Inc. | $230,132.79 |

21

**Exhibit C**

**Permitted Exceptions**

1. Agreement between City of Philadelphia and K.S.B. Inc., trading as Harvest / Apropo dated 9/2/1983 and recorded in Deed Book EFP 877 page 552.

2. Conditions disclosed by Survey made by Ben H. Joseph, Surveyor or Regulator, 3rd District dated 2/1/1954 and revised by Red J. Kubach on 12/28/1979.

3. Reciprocal Easement Agreement between The University of the Arts and Southeastern Pennsylvania Transportation Authority dated 2/5/2007 and recorded as Document No. 51630198.

4. Title to strip of ground 18 feet by 7 feet 6 inches in rear of 211 South Broad Street is excepted from the Property.

166418117.6